1  Mark Pachowicz (SBN 138108)
   **LAW OFFICES OF MARK PACHOWICZ**
2  **A Professional Corporation**
   771 E. Daily Drive, Suite 230
3  Camarillo, CA 93010
   805-987-4975
4  Mark@Pachowicz.com
   Attorneys for Plaintiffs Estate of
5  Jonathan Najera and Antonia Najera

6  Sonia M. Mercado (SBN: 117069)
   **SONIA MERCADO & ASSOCIATES**
7  5711 W. Slauson Avenue, Suite 100
   Culver City, California 90230
8  Telephone: 310.410.2981
   Facsimile: 310.410.2957
9  Soniamer2002@yahoo.com
   Attorneys for Plaintiff Alfredo Najera

10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14  ESTATE OF JONATHAN NAJERA,  ) CASE NO: CV12-03167DMG(MRWx)
    by and through Antonia Najera, )
15  ANTONIA NAJERA AND ALFREDO )
    NAJERA,                      )
16                               )  **COMPLAINT FOR DAMAGES:**
              Plaintiffs,        )
17                               )  **1) Violation of Civil Rights Causing**
                                 )  **Injury;**
18      v.                       )
                                 )  **2) Policy, Custom or Practice Causing**
19  COUNTY OF LOS ANGELES, LOS   )  **Constitutional Violation;**
    ANGELES COUNTY SHERIFF'S     )
20  DEPARTMENT, AND IN THEIR     )  **3) Failure to Train, Supervise,**
    PERSONAL CAPACITY SHERIFF    )  **Causing Constitutional Violation; and,**
21  LEROY BACA, AND DOES 1       )
    THROUGH 10, INCLUSIVE,       )  **4.) Negligence.**
22            Defendants.        )
                                 )  **DEMAND FOR JURY TRIAL**
23  _____  )

24

25  Plaintiffs jointly allege as follows:

26                        **JURISDICTION**

27  1.    This is a civil rights wrongful death/survival action arising from Defendants'

28        failure to provide for prisoner-Decedent's reasonable security, and failure to

          comply with court orders and other legal obligations occurring in Los Angeles

1   County, California, resulting in the death of Jonathan Najera on March 1,

2   2011.  This action is brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1988,

3   the Fourth, Eighth and Fourteenth Amendments to the United States

4   Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3)

5   and (4), and the aforementioned statutory and constitutional provisions.

6   Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to

7   28 U.S.C. §1367 to hear and decide claims arising under state law.  The court

8   has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

9   2.   Venue over Plaintiffs' claims is proper in the Central District of California

10   because one or more of the Defendants' principal place of business is in the

11   County of Los Angeles, and the events giving rise to the claim occurred in this

12   district.  28 U.S.C. §1391(a)(1) and (b)(2).

13   3.   Plaintiffs ESTATE OF JONATHAN NAJERA, by and through Antonia

14   Najera, ANTONIA NAJERA and ALFREDO NAJERA bring this action

15   against the COUNTY OF LOS ANGELES, the LOS ANGELES COUNTY

16   SHERIFF'S DEPARTMENT, SHERIFF LEE BACA, in his individual

17   capacity, and Does 1 through 10, inclusive.

18                          **PARTIES AND PROCEDURES**

19   4.   Plaintiff ANTONIA NAJERA is the natural mother of JONATHAN NAJERA,

20   the deceased (hereinafter "Jonathan Najera").  She also represents the

21   ESTATE OF JONATHAN NAJERA as its Successor in Interest on behalf of

22   Jonathan Najera, Deceased, under 42 U.S.C. §§ 1983, 1985 and 1988, the

23   United States Constitution, federal, state civil rights and *Cal. Code Civ. Pro.* §

24   377.20 et seq.  Plaintiffs ANTONIA NAJERA and ALFREDO NAJERA also

25   bring this action under 42 U.S.C. §§ 1983, 1988 and *Cal. Code Civ. Pro.* §

26   377.60 et seq. which provides for state wrongful death actions.

27   5.   Defendant COUNTY OF LOS ANGELES (hereinafter referred to as

28   "COUNTY"), is a chartered subdivision of the State of California with the

capacity to sue and be sued.  It owns, operates, manages, directs and controls Defendant LOS ANGELES COUNTY SHERIFF'S DEPARTMENT (hereinafter "LASD"), also a separate public entity, which employs other Doe Defendants in this action.  Defendant COUNTY is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents and agencies, including the LASD, and its agents and employees.  At all times relevant to the facts alleged herein, Defendant COUNTY was responsible for assuring that the actions, omissions, policies, procedures, practices and customs of the LASD and its employees and agents complied with the laws and the Constitution of the United States and of the State of California.

6.     Defendant SHERIFF LEE BACA (hereinafter referred to as "BACA") is and was at all times mentioned herein, and on or about March 1, 2011, the Sheriff of Los Angeles County.  He was charged by law and was responsible with the administration of defendant LASD and its employees, and for the supervision, training and hiring of persons, agents and employees working within said LASD, including officers, deputies, medical staff, mental health staff and Does 1 through 10, inclusive.  BACA is sued in his personal and individual capacity as a supervisory official for his own culpable action or inaction in the training, supervision, or control of his subordinates, and/or for his acquiescence in the constitutional deprivations which this Complaint alleges, and/or for conduct that showed a reckless or callous indifference to the rights of others.  BACA's affirmative conduct involves his failure to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others which he knew or reasonably should have known, would cause others to inflict the constitutional injury.

7.     Defendants LASD law enforcement officers (arresting officers and investigators who took his confession), the courtroom deputy and Does 1 through 10 were at all times mentioned herein, investigators, deputies,

custodial staff and employees of COUNTY and LASD. They were charged by law and were responsible with the supervision, care, security, and safety of Jonathan Najera, and were responsible for ensuring that his constitutional and statutory rights were not violated. It was the duty and responsibility of these Defendants to supervise, monitor and protect arrestees and inmates such as Jonathan Najera, under their supervision and control to ensure that other inmates or LASD employees did not harm him; to maintain his safety and security while he was under arrest and/or in the LASD jail; to not use unnecessary force on inmates; to protect inmates from excessive use of force by other deputies; to ensure inmates such as Jonathan Najera were properly classified and housed according to their classification and security risks; and, to report wrongful deputy conduct that results in the infliction of unwarranted force or violence against an inmate, and to protect Jonathan Najera from violence from other inmates and/or potential co-defendants in a criminal case from harming Jonathan Najera.

8. The true names and capacities of Defendants sued herein as DOES 1-10 ("Doe Defendants") are line supervisors and deputies or civilian employees, are unknown to Plaintiffs, who therefore sue said Doe Defendants by such fictitious names. Upon learning their nexus to this incident and their true identity, Plaintiffs will move to amend this Complaint to show their true names and capacities. Doe Defendants were at all times mentioned herein, law enforcement officers, line supervisor, civilian staff, medical providers and/or employees/agents of COUNTY and LASD, including the MCJ and the Twin Towers Medical Facilities, and at all times acted within the course and scope of that relationship. The reason why Plaintiffs are ignorant of the true names and capacities of Doe Defendants, is that same have been unascertainable as of the date of the filing of the instant Complaint, as many of these Doe Defendants may be law enforcement officers, civilian employee agents, medical staff,

doctors or nurses, policy makers and representatives of COUNTY and LASD, and as such, many of their records are protected by state statute and can only reasonably be ascertained through the discovery process.

a.  Doe Defendant Courtroom Deputy was admonished by Judge Daniel Feldstern to examine the classification of Jonathan Najera.

b.  Doe Defendant line supervisors, who were on duty at the MCJ on or about the time of this incident, are sued in their personal and individual capacity as supervisors.  They were charged by law and were responsible with the administration of the jail and its custodial facility, its deputies, civilian officers and line supervision, for training and supervising its officers, deputies and other Doe Defendants, including to ensure inmates are properly classified.  They are sued as the supervisory officials on duty at the time of this incident, and their  actions or inactions in the training, supervision, or control of their subordinates, or for their acquiescence in the constitutional deprivations which this Complaint alleges, or for conduct that showed a reckless or callous indifference to the rights of those for whom they were charged with providing security and safety.  These Doe Defendants failed to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others which they knew or reasonably should have known, would cause others to inflict the constitutional injury.

c.  Doe Defendant deputies and/or civilian employees and agents were at all times mentioned herein, charged by law with the supervision, care, security, and safety of inmate Jonathan Najera, and were responsible for ensuring that his constitutional and statutory rights were not violated.  It was the duty and responsibility of these Doe Defendants to supervise, monitor and protect inmates under their supervision and control; to properly classify and house inmates, to ensure inmates did not harm

other inmates; to maintain safety and security in the jail; to not use unnecessary force on inmates; to protect inmates from excessive use of force by other deputies; and, to report deputy wrongful conduct that results in the infliction of unwarranted force or violence against an inmate.

9.   The COUNTY is a public entity and is sued under state law, the California Tort Claims Act, *Cal. Gov. Code* § 910 et seq., for the acts and omissions of public employees/agents Does 1 - 10, and each of them, who at the time they caused Plaintiffs' injuries and damages, were duly appointed, qualified and acting officers, employees, and/or agents of COUNTY and LASD and acting within the course and scope of their employment and/or agency.

10.   Plaintiffs timely and properly filed tort claims pursuant to *Cal. Gov. Code* § 910 et seq. on August 22, 2011, Defendants denied the claim on October 13, 2011, and Plaintiffs have complied with the state claims statute and as to all state claims, this action is timely filed in accord with state law.

## PRELIMINARY ALLEGATIONS

11.   At all times relevant to the facts alleged herein, Defendants, including Does 1-10 were duly appointed, qualified and acting officers, employees, medical staff, and/or agents of COUNTY and LASD, employed as such by Defendants, and acting within the course and scope of their employment and/or agency and under color of state law.  Each of the Defendants and Doe Defendants caused and is responsible for the unlawful conduct by personally participating in the conduct, or acting jointly and in concert with others who did so by authorizing, acquiescing, condoning, acting, omitting or failing to take action to prevent the unlawful conduct by promulgating or failing to promulgate policies and procedures pursuant to which the unlawful conduct occurred; by failing and refusing, with deliberate indifference to protect Plaintiffs' rights, to initiate and maintain adequate supervision, security, training, compliance with

1    responsibilities and duties, and staffing; by failing to maintain proper and

2    adequate policies, procedures and protocols; and by ratifying and condoning

3    the unlawful conduct performed by agents and officers, deputies, medical staff

4    and employees under their direction and control.

5  12.  Whenever and wherever reference is made in this Complaint to any act by

6    Defendants and Doe Defendants, such allegations and references shall also be

7    deemed to mean the acts and failures to act of each Defendant individually,

8    jointly or severally.

9  13.  Doe Defendant law enforcement officers take an oath to uphold the U.S.

10    Constitution and California State Laws.

11                          **FACTUAL ALLEGATIONS**

12  14.  Sometime prior to and on or about March 1, 2011, Jonathan Najera, a Latino,

13    was in Defendants' custody, care, supervision, control, and protection.   On or

14    about June 19, 2009, Jonathan Najera was a minor, who had been present

15    sitting in a car when another person exited the car and shot a firearm at another

16    person.  Jonathan Najera gave arresting officers investigating the shooting his

17    observations to the shooting.  As a result LASD officials considered him to be

18    a witness to a shooting and subject to being attacked by his co-defendants and

19    their associated gang members while in custody.  Plaintiffs are informed and

20    believe that initially Jonathan Najera was classified as a security risk and

21    required to be housed accordingly for his safety.

22  15.  LASD officials conducted the investigation into the shooting and wrote reports

23    documenting their conversations with Jonathan Najera.  As a result of their

24    investigation, LASD officials produced their police reports to the Los Angeles

25    District Attorney's Office and sought the prosecution of Salvador Trujillo and

26    Richard Flores for attempted murder (*Penal Code* § 664/187) and gang

27    allegations (*Penal Code* §186.22 et seq.) based, in part, on Jonathan Najera's

28    statements.

16. LASD officials also sought the prosecution of Jonathan Najera for being present at the time of the shooting. LASD officials knew at the time they presented their investigative reports to the District Attorney's Office that pursuant to *Cal. Penal Code* §1054.1, the prosecuting attorney shall disclose to the defendant or his or her attorney all of the following material information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: the (a) names and addresses of persons the prosecutor intends to call as witnesses at trial; (b) statements of all defendants; (c) all relevant evidence seized or obtained as part of the investigation of the offenses charged; (d) the existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial; (e) any exculpatory evidence; (f) relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial. This law has been in effect since June of 1990 and all Defendants, Doe Defendants and members of LASD are taught this law and are aware of it.

17. LASD officials knew or should have known that if Trujillo and Flores were prosecuted they could receive the police reports of the discovery of their criminal case. LASD officials know based on their training and experience in the academy and learned afterward on the street, in classes and schools they attend, that investigative reports which contain statements inculpating defendants can constitute (in their vernacular) "paper." "Paper" is necessary in order for a gang to issue a hit order on a witness.

18. LASD officials are aware that *Cal. Evid. Code* § 1231 was created to introduce prior statements of deceased declarants as an exception to the Hearsay Rule

1      when a declarant has died from other than natural causes assuming the

2      statement relates to acts or events relevant to a criminal prosecution under

3      provisions of the California Street Terrorism Enforcement and Prevention Act

4      as set forth in *Cal. Penal Code* § 186.22 et seq.

5  19.  LASD officials, like California Legislatures, understand that gangs and gang

6      members often seek to eliminate witnesses to their criminal activity through

7      intimidation, violence up to and including murder.  Given the training received

8      by each sworn deputy with regard to the prosecutor's discovery obligations in a

9      criminal case along with their training on gangs and the use of gang members

10      to threaten, intimidate, hurt or kill witnesses to their criminal activity, the

11      Sheriff's Department and each of their personnel knew or reasonably should

12      have known that Jonathan Najera was at very high risk for being threatened,

13      attacked and/or killed.  LASD officials therefore acted with reckless

14      indifference in failing to protect him.  This is especially true given the

15      admonition on the record by a member of the judiciary that the Sheriff's

16      Department needed to reexamine Jonathan Najera custodial status,

17      classification and housing situation.  LASD officials who refused to heed that

18      advice acted with deliberate indifference to the health, safety and well-being of

19      Jonathan Najera and their conduct and/or omissions led directly to his death at

20      a time they knew their actions could lead to the death of Jonathan Najera.

21  20.  Before March 1, 2011, Jonathan Najera had expressly advised the Defendants

22      and other LASD jail personnel sued herein as Doe Defendants 1-10 on

23      numerous occasions that he was in fear for his life and at a risk of harm by

24      other inmates.  Plaintiffs are informed and believe that although these

25      employees at the jail were told of the risk of harm, they failed to take

26      appropriate measures to provide reasonable security for Jonathan Najera.

27  21.  On or about January 28, 2011, Jonathan Najera was at a court a hearing before

28      Judge Daniel Feldstern.  There, Jonathan Najera told his attorney that he was at

risk of harm by other inmates and the attorney relayed this information to Judge Feldstern and they discussed the inmate's safety concerns and having him reclassified for his protection.  Based on that discussion, the Court stated on the record that Jonathan Najera had been "hassled" by other inmates in his current custodial setting and the Judge ordered the Sheriff's Department representative (sued herein as a DOE Deputy 1) to "reexamine his circumstances and consider putting him in a place where he can avoid that kind of contact."  Plaintiffs are informed and believe that the Court's order to the Sheriff's department representative was either not communicated to his superiors, was ignored, or, if it was communicated, the superiors and other Doe Defendants 1-10 ignored the Court's order and their duties and responsibility toward Jonathan Najera's safety and security.

22.   On or about March 1, 2011, while in his housing cell in the 3000 housing area of Men's Central Jail ("MCJ"), Jonathan Najera was violently attacked by individuals who were acting in concert with one or more of the individuals whom Jonathan Najera implicated.  Plaintiffs are informed and believe that a physical struggle ensued and caused Jonathan Najera to fight to protect himself causing noises and disturbances in his cell and module which would have alerted Doe Defendant deputies to come to his aid to provide security and to prevent the possibility that he may be subject to physical harm.

23.   Doe Defendant deputies on duty knew, or should have known, that Jonathan Najera was at risk for being violently attacked and that he had repeatedly told Doe Defendants and MCJ Doe employees he was fearful of being attacked.  Said Doe Defendants ignored Jonathan Najera's requests for help and ignored their duty to provide reasonable security to protect him, and instead they allowed a group of violent Hispanic prison-jail gang members to beat and strangle Jonathan Najera causing his death.

24.  Said Doe Defendants continued to ignore Jonathan Najera to suffer pain and mental anguish, and to be subjected to physical abuse by others, in violation of his Eighth Amendment right to be free from unusual punishment.

25.  Defendants and Doe Defendants knew and/or had reason to know, that Jonathan Najera would be and/or was being assaulted by violent Hispanic gang members, but they were deliberately indifferent to Plaintiff's security and protection and failed to ensure his security, safety and to prevent inmate violence and harm to him.

**FIRST CLAIM FOR RELIEF FOR VIOLATION OF 42 U.S.C. SECTION 1983 AGAINST INDIVIDUAL DOE DEFENDANTS.**

26.  Plaintiffs incorporates by reference herein paragraphs 1-25 above and all paragraphs following this first cause of action, as though fully set forth.

27.  This action is brought under Title 42 U.S.C. § 1983, and on the Eighth Amendment of the United States Constitution and pursuant to the general laws of the State of California.  Plaintiffs allege that the conduct of each of these Doe Defendants deprived Jonathan Najera of his constitutional right and caused him to suffer grievous harm and physical injuries while in Defendants and Doe Defendants custody.

28.  Doe Defendant Courtroom Deputy, the deputy in the courtroom when Judge Feldstern  admonished him regarding Jonathan Najera's classification, and Doe Defendants 1-10, were trained and knew or should have known that they had a lawful responsibility for the care and safekeeping of Jonathan Najera, which duty and responsibility also included that he communicate the Judge's orders to all indicated and appropriate LASD officers.  Doe Defendants 1-10 were trained and knew or should have known that their action and/or inaction to ensure that the Court's admonishment was communicated to LASD deputies and superiors, and exclusive of the Court's admonishments, they knew or should have known that they had a duty for the care, custody and safety of

Jonathan Najera while ensuring his constitutional and statutory rights, and that ignoring that duty or failure to perform their duties could lead to assault, serious injury, or even death of Jonathan Najera.

29. Doe Defendants 1-10 ignored or turned a blind eye to their special legal and professional responsibility to ensure proper classification and housing for Jonathan Najera, they ignored or failed to ensure his security and to ensure his protection; they failed to follow policies and procedures regarding classification and housing for inmates such as Jonathan Najera, and were trained and knew or should have known that failure to do so could and/or would lead to the assault, serious injury, or even death of Jonathan Najera.

30. Doe Defendants 1-10 ignored these duties and responsibilities knowing that they had an affirmative duty to protect Jonathan Najera while under their custody, and they acted with deliberate indifference to Jonathan Najera's constitutional right to reasonable security while in custody.

31. As a legal cause of Doe Defendants 1-10 actions and/or inactions, ignoring the Court's admonishment, ignoring their duties and responsibilities to provide adequate and appropriate classification and housing accommodations, their failure to provide reasonable security and their deliberate indifference to Jonathan Najera's right to reasonable security, Jonathan Najera was assaulted and beaten to death.

32. As a legal cause of Doe Defendants 1-10 actions and inactions, Jonathan Najera suffered serious and cruel unusual punishment and physical pain and anguish before his death. Plaintiffs Antonia Najera and Alfredo Najera were deprived of their constitutional rights to familial relationship.

33. The Estate of Jonathan Najera claims damages as a survivor action under federal law and claims as damages for the loss of his right to life and of the injuries, pain and emotional anguish and trauma he suffered prior to his death.

34.   As a legal cause of Defendants' and Doe Defendants' actions and/or inactions and deliberate indifference to the constitutional rights of Plaintiffs, Antonia Najera And Alfredo Najera suffered loss of society, comfort, companionship, solace, assistance, love, affection, financial support, services of their son and incurred burial and funeral expenses, and suffered and continue to suffer these damages.

35.   By virtue of the provisions of 42 U.S.C. Section 1988, Plaintiffs are entitled to and demand an award of reasonable attorneys' fees and costs according to proof.

36.   Each individual Defendant and Doe Defendant acted recklessly or with callous indifference to Jonathan Najera's right to reasonable security and to Plaintiffs' constitutional rights and should be assessed punitive damages.

**SECOND CLAIM FOR RELIEF AGAINST COUNTY AND LASD FOR CUSTOM, POLICY AND/OR PRACTICE CAUSING CONSTITUTIONAL VIOLATIONS.**

37.   Plaintiffs incorporates by reference herein paragraphs 1-35 above and all paragraphs following this second cause of action, as though fully set forth.

38.   At all times herein mentioned, Defendants COUNTY, LASD and Does 1 - 10, and each of them, maintained customs or practices that posed a substantial risk of serious harm to inmates in Jonathan Najera's situation and each defendant knew that the following custom, policies or practice posed this risk of harm:

(1) improper classification and housing of inmates;

(2) failure to protect inmates who have provided information to law enforcement that implicated co-defendants and/or other individuals in custody;

(3) failure to properly classify prosecution witness inmates and their other co-defendants understanding that they all have legal access to paperwork created by police and district attorney investigators.

(4) failure to provide reasonable security and/or prevent abuse of inmates by other inmates;

(5) failure to supervise, investigate and take corrective actions in incidents of failure to provide reasonable security resulting in inmate-on inmate violence;

(6) condoning lax supervision of incidents of deputies' use of unreasonable force on inmates;

(7) condoning lax supervision by line supervisors who fail to report or investigate deputies and supervisors who fail to provide reasonable security resulting in inmate on inmate violence;

(8) condoning lax supervision by line supervisors who fail to report or investigate deputies who use excessive force on inmates;

(9) assigning deputies with known histories of misconduct including criminal conduct in accord with a LASD custom of using assignment to custody facilities as punishment for problem deputies as a way of keeping them from the public;

(10) ratifying wrongful conduct by deputies and line supervisors that result in serious injuries to inmates or deaths of inmates, civil litigation, judgments and settlements by failing to implement corrective action to prevent repetition of the wrongful conduct;

(11) inadequate staffing of custody positions to provide reasonable security to inmates;

(12) condoned, ratified, encouraged or made possible vigilante justice at MCJ which encouraged inmate on inmate violence.

39.     Plaintiffs are informed and believe and thereon allege that Defendants and Does 1 -10, each had a history and propensity for acts of the nature complained of herein and manifested such propensity prior to and during their employment and/or agency with defendants COUNTY and LASD.  Plaintiffs are further informed and believe and thereon allege that these Defendants and Does 1-10,

1   knew, or in the exercise of reasonable care should have known, of such prior

2   history and propensity at the time such individuals were hired and/or during the

3   time of their employment.  These Defendants' disregard of this knowledge

4   and/or failure to adequately investigate and discover and correct such facts

5   caused the violation of Plaintiffs' constitutional rights.

6   40.   The above alleged customs or practices were a legal cause of Plaintiffs'

7   injuries, and each individual Defendant and Doe 1-10 acting in accord with

8   these customs or practices acted with deliberate indifference to the needs of

9   persons such as Jonathan Najera, who was in the custody, control and care of

10   Defendants.

11   **THIRD CLAIM FOR RELIEF AGAINST DEFENDANT BACA AND**

12   **DOES 1-10 IN THEIR PERSONAL CAPACITY, FOR FAILURE TO**

13   **TRAIN AND SUPERVISE CAUSING CONSTITUTIONAL**

14   **VIOLATIONS**

15   41.   Plaintiffs restate and reiterate paragraphs 1-40 above and all paragraphs

16   following this third claim for relief, as though fully set forth.

17   42.   DOES 1-10 are sued in their individual and personal capacity as supervisors of

18   the line officers on duty at the time of this incident, and for their ongoing

19   duties as supervisors responsible for the safety and security of inmates in the

20   Men's Central Jail.

21   43.   Sheriff BACA is sued in his individual and personal capacity.  Before March 1,

22   2011, BACA knew or reasonable could have known, of his subordinates'

23   ongoing constitutional violations, the failure to provide reasonable security at

24   the jail, failure to prevent inmate on inmate violence, failure to monitor

25   inmates, use of excessive force on inmates, failure to investigate incidents of

26   involving violence, failure to protect and BACA failed to act to prevent them

27   and he acquiesced, condoned or ratified a custom, practice or policy of ongoing

28   misconduct by his subordinates.  BACA is sued in his individual capacity for

his own culpable action or inaction in the training, supervisor, or control of his subordinates, or for his acquiescence in the constitutional deprivations as alleged herein, or conduct that showed a reckless or callous indifference to the rights of inmates such as Jonathan Najera by implementation of policies, rules or directives BACA's actions and/or inactions set in motion a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional violations alleged herein.

44.  Plaintiffs are informed and believe and thereon allege that prior to the incident alleged herein, on or before 1997, and subsequent hereto, BACA knew or reasonably should have known, that sheriff deputies and custody personnel employed by COUNTY and LASD, in the course and scope of their employment under color of law, committed similar acts of failure to provide reasonable security, failure to monitor inmates under their watch, abandonment of their post, ignoring inmate-on-inmate violence, deputy battery and assault of inmates, failure to report deputy battery and assault on inmates, failure to investigate deputy misconduct and violation of inmates constitutional rights, which wrongful conduct resulted in inmate-on inmate injuries and deaths and ongoing use of excessive force on inmates, and delayed or denied inmates' access to medical care.

45.  Sheriff BACA became aware, or should have become aware, of repeated incidents of supervisors failing to supervise subordinates who were deliberately indifferent to:

(1) the necessity to provide reasonable security to protect inmates from inmate on inmate violence;

(2) incidents of deputies using excessive force on inmates;

(3) incidents of deputies and supervisors adhering to a "code of silence" resulting in failures to report deputies' wrongful and unconstitutional conduct;

1   (4) incidents of condoning, ratifying, encouraging or making possible vigilante

2   justice at MCJ which encouraged inmate on inmate violence;

3   (5) incidents of failing to conduct investigations or conducting shoddy

4   investigations of incidents;

5   (6) ratifying wrongful conduct by deputies and line supervisors that resulted in

6   serious injuries to inmates or deaths of inmates, civil litigation, judgments and

7   settlements by failing to implement corrective action to prevent repetition of

8   the wrongful conduct;

9   (7) incidents of failure to protect inmates who have provided information to

10   law enforcement that implicated co-defendants and/or other individuals in

11   custody;

12   (8) incidents of failure to properly classify prosecution witness inmates and

13   their other co-defendants understanding that they all have legal access to court

14   testimony or paperwork created by police and district attorney investigators;

15   and,

16   (9) failure to timely and promptly perform investigations into jail violence

17   resulting in inmates death and/or serious injuries.

18  46.  Some of the above incidents, reports by his lawyers at the Office of

19   Independent review (OIR) and the COUNTY'S Special Counsel which gave

20   notice to BACA and Doe Defendants of unconstitutional wrongful conduct

21   caused by a failure to provide reasonable security to inmates as required by

22   *Farmer v. Brenner,* are set forth as follows: Beginning in June 1996, the U.S.

23   Department of Justice ("DOJ") began investigations of conditions at Los

24   Angeles County Jails.  On September 5, 1997, it gave BACA, then a top

25   supervisor, clear written notice in a "findings letter" of a continued and serious

26   pattern and practices of constitutional violations including, abuse of inmates by

27   sheriff's deputies working in the jail and inmate on inmate violence.  BACA

28   was a supervisor and then a member of the Sheriff's Executive Council and he

1    reviewed the DOJ's findings and thus was on notice of the continued serious

2    pattern, practice or custom of constitutional violations in the LASD and its jail.

3    47.   In 1999, under threat of a lawsuit by the DOJ, BACA and the COUNTY

4    submitted to a Memorandum of Understanding ("MOU") with the DOJ which

5    required BACA and the COUNTY to address and correct the continuous

6    constitutional violations to which inmates were being subjected, particularly

7    inmates suffering from mental problems.  BACA personally signed the MOU.

8    However, after years of monitoring the County Jail system, under the authority

9    of the MOU, in 2003, the DOJ experts issued a report which still found

10   noncompliance with many of its recommendations regarding the abuse of

11   inmates and the deficiencies which continue at county jail which constitute a

12   pattern and practice of constitutional violations.  BACA received the

13   monitoring reports and was responsible for the institution of policies and

14   procedures to correct the unconstitutional conditions, but failed to do so.

15   48.   BACA was made aware of widespread abuses in the jails through civil

16   litigation against him, LASD and the jail which put him on clear notice of the

17   culture of impunity among his deputies and subordinates.  BACA ignored and

18   turned a blind eye to the violence in his jails.  Some of the incidents which

19   gave BACA and Doe Defendants 1-10 of ongoing jail violence due to lapses

20   and lack or reasonable security, deputy and line supervisors' wrongful conduct,

21   and of a tolerance, encouragement or condoning of vigilante jail violence

22   resulting in inmates deaths and serious injuries similar to that of Jonathan

23   Najera:

24   49.   On July 6, 2002, Ramon Gavira was severely beaten by a female deputy and

25   later, according to forensic evidence, was killed in his cell at county jail.

26   Deputies and staff testified that they were not investigated nor disciplined for

27   lapses in supervision of Mr. Gavira and allegations that Mr. Gavira had been

28   physically abused by deputies.  BACA knew of this death because his lawyer,

-18-

1   Michael Gennaco, was personally present at this death review and BACA was

2   sued and deposed regarding this death and was personally advised of the

3   failure to investigate and no discipline being imposed although witnesses to the

4   beatings of Gavira told homicide investigators of the deputy misconduct.

5   50.   On March 23, 2003, BACA again was given notice of the failure to provide

6   reasonable security when the COUNTY and LASD approved a settlement in a

7   civil action where Ahmad Burrell, Rory Fontanelle, and Aaron Cunningham

8   were attacked over a three day period, sustaining serious injuries.  Although

9   the deputies had known that Hispanic gangs were going to attack African

10   Americans, nonetheless by the third day of the attacks, the deputies failed to

11   provide reasonable security and Burrell was attacked in the housing dormitory

12   and the attackers were able to stab him twenty four (24) times, some causing

13   serious and permanent injury to his abdomen and head.  He suffered permanent

14   brain damage.

15   51.   On October 21, 2003, inmate Ki Hong was killed by three inmates who entered

16   the dayroom where Hong was housed.  Inmate Hong was stabbed, beaten and

17   strangled to death approximately 1½ hours after he arrived at his housing in

18   Men's Central Jail.  Inmates Lee and Cho allegedly killed him while inmate

19   Chung acted as lookout and while the other 57 inmates housed in the dayroom

20   undoubtedly looked on. Notice of numerous violations showing deputies

21   failing to provide reasonable security and abandoning duties, their lax

22   discipline and failure to supervise were given to BACA by his in-house

23   lawyers, yet the inmate on inmate violence continued.  This was the first of five

24   inmate-on-inmate killings that occurred in the jail system over a six month

25   period.

26   52.   On December 6, 2003, Inmate Prendergast was beaten periodically over several

27   hours from about 6:00 p.m., to early next morning by inmates Newell and

28   Ferman, two of his three cellmates. Newell and Ferman had been drinking

"pruno," an alcoholic brew made in the cell, before they attacked Prendergast

because he, according to them, exhibited strange behavior and talked to himself.  Again, notice of numerous violations showing deputy and line officers failing to provide reasonable security to the entire cell block, lax discipline and failure to supervise were presented to BACA, yet the inmate on inmate violence continued.

53.    On December 9, 2003, inmate Mario Alvarado, aka Victor Cortez, was killed in a holding cell while awaiting transfer to the Pitchess Detention Center.  A short time after he arrived at the holding cell, which contained 40 inmates, he was attacked by one or more other inmates, who punched and kicked him until he lost consciousness and continued to beat him afterward.  Deputies responsible for providing reasonable security failed to perform to do so, and the inmates who beat Alvarado had so much time they concealed his dead body under clothes and trash behind a three-foot privacy wall in a toilet area. Deputies responsible for accounting for Alvarado called out his name from the list, but when he did not respond, they assumed he had never been placed in the cell.  Approximately seven hours after his assault, a worker inmate cleaning the cell discovered his body and notified deputies.  Again, notice of numerous violations showing deputy failing to provide reasonable security to the holding cell, lax discipline and failure to supervise were presented to BACA, yet his response, if any, was not apparent and the inmate on inmate violence continued.

54.    On December 13, 2003, Jose Beas was a pre-trial detainee, having been arrested on December 3, 2003, by deputies for an accusation of child molestation.  It was later discovered that the investigating deputy had falsified the contents of a tape recorded statement of Jose Beas in the arrest report, claiming that Beas had admitted to inappropriate touching of a minor when the tape recording did not contains such a statement.  After being classified as a inmate that was to be kept away from all general population inmates, and being

given a wrist band that identified him as such, he was taken to county jail and
placed in a holding tank with many general population inmates.  Beas was
immediately beaten by the other inmates and suffered brain damage.  BACA
was named as a defendant in that civil case and knew of the allegations of
failure to provide reasonable security to the holding cell, lax discipline and
failure to supervise and approved the settlement, yet, his response, if any, was
not apparent and the inmate on inmate violence continued.

55.   On January 12, 2004, inmate Kristopher Faye was stabbed to death by several
inmates with jail-made knives on the lower tier of his module after he lowered
himself down from the upper tier balcony and attempted to use the phones.
Fay was African American and the attackers were Hispanic.  Deputies
responsible for keeping the cell gates in the housing module closed allowed all
the cell gates in the module to remain open which increased the danger of
violence and was in violation of LASD policy.  The failure to provide
reasonable security resulted in fighting between the two racial groups which
resulted in racial disturbance.  Numerous violations showing errors in
classification, placing highly dangerous inmates with histories of violence with
non-violent inmates presenting low security risk, deputy failing to provide
reasonable security to the holding cell, lax discipline and failure to supervise
were again presented to BACA in official reports, yet his response, if any, was
not apparent and the inmate on inmate violence continued.

56.   On April 20, 2004, inmate Raul Tinajero was killed in his cell in the jail, by
inmate Santiago Pineda.  Pineda had a history of prior misconduct in the jail
but deputies failed to follow procedures and write disciplinary reports of this
misconduct.  Pineda had also previously escaped from the jail and was wrongly
classified when he killed Tinajero.  Tinajero was to be a witness in a criminal
case against Pineda.  Pineda was able, improperly, to leave his cell unnoticed
by deputies who were responsible for monitoring his cell, walk across the jail

unnoticed to find Tinajero's cell.  Due to the monitoring failures of the deputies and inadequate procedures with regard to the escorting of inmates, Pineda was able to enter Tinajero's cell unchallenged by the deputies responsible for providing reasonable security, kill Tinajero undetected, remain in Tinajero's cell for five hours undetected by deputies.  Numerous violations showing errors in classification, deputies failing to provide reasonable security to the housing cells, lax discipline and failure to supervise were again presented to BACA in official reports, yet his response, if any, was not apparent and the inmate on inmate violence continued.

57.  On May 24, 23, 2004, Antonio Fernandez, was housed in a dormitory with four other inmates.  He was accused by his cell mates of taking an item of personal property.  The deputy that was assigned to monitor the dormitory had abandoned her duties and left her post unattended, and the post was vacant for approximately 20 minutes during which time the assault occurred.  The beating lasted a significant amount of time and the assailants were able to take Fernandez's body to the rear of the dormitory and conceal him.  Despite the error in abandoning her post by the deputy and the failure to provide reasonable security to housing area, lax discipline and failure to supervise were again presented to BACA, yet his response, if any, was not apparent and the inmate on inmate violence continued.

58.  BACA received notice from The Special Counsel to the Los Angeles County Sheriff's Department, in the 17th Semiannual Report (February 2004) and the 18th Semiannual Report (August 2004) of increasing levels of inmate violence in the jails.  The report pointed out that although there was a system that reviewed incidents of inmate disturbances and riots with the purpose that its causes could be identified and that any implications for changes in policy, tactics, or training could be analyzed to improve security in the future, and that some of the recommendations may have prevented much more serious

incidents from occurring, that BACA's system in place for managing this information does not provide for its systematic, division-wide dissemination.

59.    In February 2005 BACA received notice from The Special Counsel to the Los Angeles County Sheriff's Department, in the 19th Semiannual Report that his deputies conduct was ending up costing county tax payers millions of dollars annually in payments of civil judgments and settlements, in cases where the internal investigations had found no wrong doing.  In all, BACA was notified by his Special Counsel that a review of twenty nine (29) cases involving police misconduct and settled for $100,000 or more over the past five years, only eight resulted in any type of discipline to the involved officers or policy change in the Department.  Thus, BACA was again aware of the systematic deficiencies in supervision and lax discipline, but has failed to made policy changes knowing the risk of harm created by allowing misconduct to go unaddressed.

60.    On February 3, 2005, the finding of inmate abuse were again publically presented to BACA by Special Counsel Merrick Bobb, in a  report to the Board of Supervisors finding that "Los Angeles County's largest jail is so outdated, understaffed and riddled with security flaws that it jeopardizes the lives of guards and inmates."  The Special Counsel's report criticized the County Jail in downtown Los Angeles for "failing to prevent dangerous inmates from being housed with lower-risk inmates. . . ." The report concluded that Mens' Central Jail "is nightmarish to manage" and suffers from "lax supervision and a long-standing jail culture that has shortchanged accountability for inmate safety and security."

61.    In August of 2005, BACA received notice from The Special Counsel to the Los Angeles County Sheriff's Department, in the 20th Semiannual Report that his management of the custody facilities was resulting in deputies having very low morale and bitterness due to stagnation in jail assignments for an average of

five to seven years.  The Report pointed to a substantial number of deputies in custody assignments leaving LASD for positions with other police agencies (sixty five in five months) resulting in insufficient staffing and forcing overtime replacements.  The Report advised BACA that any longer than two years in a custody assignment is not good for the deputies, the inmates, the LASD or the public as deputies eager to get to a patrol assignment may become bitter, jaded and complacent.  BACA is aware of the risk of harm created by these policies and yet there has been no change apparent notwithstanding his counsel's recommendations.

62.   On August 22, 2005, BACA was deposed in the lawsuit by the family of Ramon Gavira, a person with mental disabilities arrested for driving under the influence of alcohol, who was severely beaten by a female deputy and later, according to forensic evidence, was killed in his cell at county jail.  In his deposition BACA was personally advised of the continued failure to of his subordinates to investigate and no discipline being imposed although witnesses to the beatings of Gavira told homicide investigators of the deputy misconduct.  Further, in that deposition, he was presented with a letter dated March 13, 2003, to Donna Bruce Koch, Senior Deputy County Counsel, and to Victor W. Wright, Principal Deputy County Counsel from William G. Maddox, Senior Trial Attorney, Special Litigation Section of the United States Department of Justice, Civil Rights Division which contained a report from three Doctors who inspected the County jail to determine compliance with the Memorandum of Understanding (MOU) ( see ¶s 38-39) which contained 27 findings of noncompliance of 44 areas requiring compliance with the MOU.  Yet, as of January 11, 2012, BACA personally reported to the Board of Supervisors that a disproportionate numbers of mentally ill inmates were still being subjected to abuse and excessive force due to a failure to train and supervise his deputies in the jail.

63. On October 24, 2005, Chadwick Shane Cochran, was booked into county jail for a non-violent misdemeanor.  His mental health screening revealed a history of mental illness controlled by psychiatric drugs that was confirmed by the Los Angeles County Mental Health Clinic, and he was classified to be housed in a mental health facility located within the jail with suicide and assault precautions for his safety.  Due to errors by staff his protective housing was terminated and he was sent to general population on November 16, 2005, where he was beaten to death a few hours later that day.  Deputies compounded the error of removing Cochran from protective status and left a red color identification card which led the attacking inmates to believe that he was a "snitch" or informant. The deputies responsible for the safety of inmates abandoned their post and supervision of the locked day room in which 40 other inmates, some of whom were classified as violent "high risk" accused murderers and gang members, and known violent offenders.  Cochran was screaming and many other inmates were yelling for them to stop, but no deputy resumed their responsibility to provide reasonable security until the inmates had grown tired of beating Cochran and hide his body under clothing and food trays.  The numerous errors in classification, deputies failing to provide reasonable security to the day room housing cells, lax discipline and failure to supervise were again presented to BACA in official reports and he also learned of them as he was sued and served in a lawsuit by the family.

64. On January 27, 2006, Dion Starr, an African American was a pretrial detainee at MCJ, located in the same housing row where Mr. Cochran was killed three months before.  While in his cell, the monitoring deputy first violated security procedures when he opened the row gate for three unauthorized gang members without checking their identification, then allowing them to gather in front of Starr's cell door and opening Starr's cell gate thereby giving access to the Latino jail-prison gang members (known as "Southsiders") who attacked Starr

and his African American cell-mate and stabbed Starr 23 times.  While Starr laid on the floor bleeding and hurt, a deputy used excessive force and without justification kicked him in the face for moving, causing him further injuries and pain, and subsequently denying Starr access to medical care.  This incident involved some of the same deputies involved in the Cochran incident.  BACA was again personally given notice of this incident and the constitutional violations of failure to provide reasonable security, use of excessive force and denial of access to medical care caused by his subordinate deputies and supervisors.  Notwithstanding the notice that his supervisors failed to investigate the stabbing and the deputies involved were not questioned or investigated, BACA did nothing.

65.  In the 22nd Semiannual Report of Special Counsel Merrick J. Bobb and the Police Assessment Resource Center ("Bobb Report") published in August 2006 – eighteen months before the inmate on inmate attack on Justin Henderson, provided BACA and the County with an overview of the role that jail gangs play in regulating life in the dormitories, with particular reference to the "Southsiders" – described in the Bobb Report as the largest gang operating in the County jails.  It describes the Southsiders as "a jail gang made up of all members of local Latino street gangs.  The name 'Southsiders' is not a reference to South Los Angeles, but rather refers to the fact that gang members are all from Southern California.  The Report explained to BACA that the Southsiders seek to control all aspects of jail life, from dictating schedules for using showers to charging non-Southsiders "rent" to obtain access to the commissary.  Southsiders enforce their rule with violence, administering beatings – known as "regulations" – when infractions occur.  However, Plaintiffs allege that notwithstanding the Bobb Report, BACA took no steps to address the risk of harm presented by the Southsiders to reduce or minimize the influence of the Southsiders.  Plaintiffs are informed and believe and thereon

1   allege that members of the Southsiders are responsible for the death of

2   Jonathan Najera.

3   66.   On February 24, 2008, following a dispute with another inmate about a deck of

4   cards, roughly twelve to fifteen inmates attacked Justin Henderson in the

5   housing area.  After one of the attackers struck him in the head and knocked

6   him to the ground, roughly a dozen other inmates – all members of the Latino

7   jail gang, the Southsiders – repeatedly stomped on him with their feet. Several

8   of the dorm's white inmates (Henderson is white) attempted to intervene, but

9   they were pushed aside by other Southsiders.  Deputy Lopez - the officer

10   staffing two housing modules – was the only jail official visually monitoring

11   the Dorm at the time of the attack. He observed the inmates separating along

12   racial lines, but claimed he did not see the initial attack.  Between five and ten

13   minutes after the attack began, the attack ended dissipated and the inmates

14   obeyed a command, issued over the intercom system, to return to their bunks

15   Eventually, a radio call resulted in a number of other officers arriving on the

16   scene. Henderson suffered a severe traumatic brain injury as a result of the

17   attack.  Plaintiffs are informed and believe that BACA in response to

18   interrogatories acknowledged reviewing the Bobb Report and knowing about

19   problems with inmate-on-inmate violence in the jail. BACA moved to dismiss

20   the claims against him and on October 23, 2009, the Court denied the motion,

21   concluding that "the facts set forth in the [complaint] are sufficient to give rise

22   to a finding that Sheriff BACA was aware of a pattern of inmate-on-inmate

23   violence [in the housing area], and he failed to take reasonable precautionary

24   measures that would have prevented the attack on Justin Henderson."

25   67.   Michael Gennaco, of the Office of Independent Review (hereinafter "OIR"),

26   BACA's lawyers, who review investigations, Public Oversight Report 1st

27   Quarter 2007, continue to give notice to BACA of deputies abandoning their

28   posts, failing to properly classify, failing to monitor, falling asleep, not

following procedures, failing to conduct timely security checks, deputies left inmates unsupervised, including deputy use of excessive force, and deputies encouraging inmate on inmate fights.  Although some discipline was imposed, BACA failed to supervise the supervisors who were on duty for their failure to report and recommend discipline and the misconduct continued.

68.    In April 2009, BACA's attorney, Michael Gennaco, again reported to BACA in OIR's 7th Annual Report the practice-custom of assigning problem deputies with known histories of misconduct including criminal conduct as punishment as a way of keeping them from the public, criticizing what he termed "disciplinary transfers."  BACA's attorney advised BACA that this practice and custom allowed problem deputies to negatively influence the younger deputies, who start their careers in the jails. Notwithstanding OIR'S notice of the dangers of this practice-custom, as of the death of Jonathan Najera, BACA had not ordered a stop to it and as late as November 2011, he acknowledged that the department moved disciplined deputies to the jail to keep them from the public and assign them less challenging jobs than patrol.

69.    Before March 1, 2011, BACA had received continued repeated reports from his attorneys at the OIR (e.g., 2nd Annual Report 2003, Part 3, *False Statements/Integrity* and the 3d Annual Report, Part 4, *Preserving the Integrity of the Discipline Process for False Statements*) of a code of silence where deputies would not come forward to testify about misconduct of other officers involving a wide range of misconduct including the failure to provide reasonable security in Men's Central Jail where Jonathan Najera died as well as other custody facilities.  Thus, in 2007, the County Board of Supervisors approved and allocated a large budget request to have LASD install cameras in multiple locations in MCJ to minimize the code of silence as well as protect deputies and the County from false claims of misconduct by inmates.  BACA failed to have the cameras installed despite the notice and the funding.

70.  In October 2011, after Jonathon Nareja's death, BACA's attorney again reported to him (OIR 2011 Report on Violence in the Jails, *Holding Deputies Accountable*) that a code of silence among guards in Los Angeles County jails continues to hinder investigations into abuse complaints, while deputies who report wrongdoing are sometimes subjected to retaliation by colleagues.  This is almost exactly the same conclusion reached by Michael Gennaco in OIR's 2nd Annual Report October 2003.  Notwithstanding the notice provided to BACA by the repeated expressions of concern by the Board of Supervisors and repeated additional funding allocations to fund security cameras in the jails, yet as of the date of the death of Jonathan Najera, BACA had not utilized the allocated funds to install the cameras that could have prevented Jonathan Najera's death as well as document the many other instances of misconduct and failures of reasonable security.

71.  In November 2011, the American Civil Liberties Union released a public report to BACA reporting that LASD deputies have come forward publicly with reports that deputy gangs thrive inside the jails and foment deputy-on-inmate violence. They present a picture of LASD deputies who treat acts of deputy-on-inmate violence as badges of honor, and demand such violence as rites of entry to their gangs. According to deputy reports, deputies instill in their members the idea that devotion to the group – rather than their professional responsibilities – is of the utmost importance.  Two LASD deputies have filed a lawsuit alleging that they were beaten by a gang of deputies who call themselves "the 3000 Boys," named for the 3000 level of Men's Central Jail, where its members work and where Jonathan Najera was killed. The lawsuit alleges that the LASD cultivates "gang-like activity" among jail deputies, fomenting violence against and between inmates, and against other deputies. The deputies allege that the LASD is "grossly inadequate" in "disciplining and controlling… deputies, particularly with respect to illegal acts and acts of

excessive force." Notwithstanding these public revelations BACA has not attempted to investigate the allegations, but instead maintain that these deputy gangs pose no problems. The ACLU Report concludes that BACA and other top LASD officials turn a blind eye to the gang-like behavior of some deputies, thus "implying tacit approval of unprofessional conduct in the lower ranks." This constitutes clear support for the conclusion that BACA continues to approve and condone lax discipline and fails to supervise his subordinates who allow constitutional violation.

72.   BACA is sued in his personal and individual capacity as a supervisory for his own culpable action or inaction in the training, supervision, or control of his subordinates, or for his acquiescence in the constitutional deprivations which this Complaint alleges, or for conduct that showed a reckless or callous indifference to the rights of others. BACA'S affirmative conduct presented in this claim involves his failure to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others which he knew or reasonably should have known, would cause others to inflict the constitutional injury to Plaintiffs.

73.   As a result of BACA's actions and/or inactions and/or policies are themselves a repudiation of constitutional rights and are the moving force of the constitutional violations, and the above policies, practices and customs were in force on or about March 1, 2011, and were the moving force of Does 1-10 unconstitutional conduct and deliberate indifference to Plaintiff's security which allowed jail gang inmates with predispositions to use force and intimidation on Jonathan Najera, they failed to provide security or protect him and as a result, he was brutally beaten and killed over a period of time by other inmates while the deputies and officers responsible for Plaintiff's security, care and protection, abandoned their duties. As a result Estate of Jonathan Najera, Antonia Najera And Alfredo Najera was harmed in the manner threatened by

the failure to train, supervise, investigate or instruct subordinates in the manner herein stated.

74. Doe Defendant Supervisors knew, or in the exercise of reasonable care should have known, of such prior history and propensity at the time of this incident for similar acts of inmate on inmate violence, and knew or should have known of the many incidents of killings as above stated, most of which occurred in their facility, and that sheriff deputies and their supervisors had prior to the commission of the acts complained of herein, acting under the color of their authority as deputies in the course and scope of their employment as such, committed similar acts of failure to supervise subordinates, failure to provide reasonable security, lapse in security, abandonment of their post, allowing violent inmates access to other inmates, deliberate indifference to the necessity to protect inmates, to report deputy wrongful conduct, to prevent unreasonable use of force, to provide access to medical care to inmates.

75. Plaintiffs are further informed and believe and thereon allege that these line supervisors knew, or in the exercise of reasonable care, should have known of this custom, policy, pattern or practice of unconstitutional violations, or in the existence of facts which creates the potential of unconstitutional acts, and these Defendants, had a duty to investigate their subordinates, and to instruct their subordinates to prevent similar acts to other persons, but failed to take steps to properly train, supervise, investigate or instruct deputies, jailers, and as a result Plaintiffs were harmed in the manner alleged herein by the line supervisors' failure to train, supervise, investigate, instruct and take corrective measures.

76. As legal cause of the conduct of these defendant supervisors actions or inactions, as described above, Plaintiffs were damaged and injured as alleged above, as set forth above.

77. Each individual Defendant and Doe Defendant acted recklessly or with callous indifference to Jonathan Najera's right to reasonable security and to Plaintiffs' constitutional rights and should be assessed punitive damages.

**AS A FOURTH CAUSE OF ACTION PLAINTIFFS ALLEGE NEGLIGENCE AGAINST ALL DEFENDANTS AND DOE DEFENDANTS.**

78. Plaintiffs incorporates by reference herein paragraphs 1-35, 39-76 above as though fully set forth herein.

79. On or about March 1, 2011, while in his housing cell in the 3000 housing area of MCJ, due to the negligence of each defendant, Jonathan Najera was violently attacked by individuals who were acting in concert with one or more of the co-defendant individuals whom Jonathan Najera had implicated by his statements to LASD arresting officers and used by the District Attorney to prosecute them.

80. Each Defendant and Doe Defendant was negligent in the performance of his/her custody deputy tactics and duties and this negligence was a cause of Plaintiffs' injuries and damages.  Defendants and Doe Defendants failed to comply with their above stated custody tactics and duties and their conduct was at all times mentioned herein, below the standard of care for reasonable custody deputies, and this negligence caused the injuries and damages alleged herein.

81. Defendants, BACA, COUNTY and Doe Defendants, acting within the course and scope of their employment with Defendants County and LASD, breached their duty to assure the competence of Doe Defendants 1-10, failed to exercise ordinary care under the circumstances herein alleged to evaluate and to assure the competence of Does 1-10, and breached their duty of selecting, training, reviewing and periodically evaluating the competency of these individually named deputies.  This breach of duty of careful selection, training, review and

1    periodic evaluation of the competency of such custody deputies created an

2    unreasonable risk of harm to persons such as Plaintiff Jonathan Najera.

3    82.   As a direct and legal result of the aforesaid negligence, carelessness and

4    unskillfulness of defendants, and each of them, Plaintiffs were injured, and

5    have suffered the damages as alleged above.

6    **WHEREFORE**, Plaintiffs prays for relief as follows:

7    1.    For general damages according to proof;

8    2.    For past, present and future special damages according to proof;

9    3.    For other losses in an amount according to proof;

10   4.    For costs of suit and reasonable attorneys' fees  permitted pursuant to 42

11         U.S.C., §1988;

12   5.    For exemplary damages against individual defendants where

13         appropriate; and

14   6.    For such further relief as the court may deem just and equitable.

15   Dated: April 10, 2012                  Respectfully submitted,
16                                          **LAW OFFICES OF MARK PACHOWICZ**

17

18                                          By:
19                                              Mark Pachowicz, Counsel for Plaintiffs
                                                Antonia Najera and the Estate of
20                                              Jonathan Najera

     Dated: April 10, 2012                  Respectfully submitted,
21                                          **SONIA MERCADO & ASSOCIATES**

22

23                                          By:
24                                              Sonia Mercado, Counsel for Plaintiff
                                                Alfredo Najera
25   //

26   //

27   //

     //
28

PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.

Dated: April 10, 2012

Respectfully submitted,
LAW OFFICES OF MARK PACHOWICZ

By:
Mark Pachowicz, Counsel for Plaintiffs
Antonia Najera and the Estate of
Jonathan Najera

Dated: April 10, 2012

Respectfully submitted,
SONIA MERCADO & ASSOCIATES

By:
Sonia Mercado, Counsel for Plaintiff
Alfredo Najera